# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JADAIR INTERNATIONAL, INC.,

                Plaintiff,

v.

AMERICAN NATIONAL PROPERTY
AND CASUALTY COMPANY,

                Defendant.

Case No. 21-CV-1103-JPS

**ORDER**

## 1.    INTRODUCTION

On September 21, 2021, Plaintiff Jadair International, Inc. ("Jadair") filed this action, alleging claims for (1) declaratory judgment and (2) bad faith denial of benefits against Defendant American National Property and Casualty Company ("ANPAC"). ECF No. 1. On October 26, 2021, ANPAC answered Jadair's complaint, and also asserted a counterclaim for declaratory judgment against Jadair. ECF No. 5. The action presently comes before the Court on the parties' cross-motions for summary judgment. ANPAC moves for summary judgment on both of Jadair's claims, as well as for entry of declaratory judgment in its favor on its counterclaim. ECF No. 17. Jadair purports to do the same, moving for summary judgment in its favor "on all claims." ECF No. 23; *see also* ECF No. 22. For the reasons stated herein, the Court will grant ANPAC's motion for summary judgment on both of Jadair's claims and will grant ANPAC's motion for declaratory judgment and enter declaratory judgment in ANPAC's favor on its counterclaim. ECF No. 17. The Court will deny Jadair's motion for summary judgment and declaratory judgment. ECF No. 22.

## 2. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

Under Federal Rule of Civil Procedure 57 and the Declaratory Judgment Act, 28 U.S.C. § 2201, the court has "discretionary power to issue declarations regarding the rights and other legal relations of any interested party seeking such declaration," so long as it is presented with an "actual controversy between the parties." *Murillo v. Kohl's Corp.*, 197 F. Supp. 3d 1119, 1136 (E.D. Wis. 2016) (citations omitted). An "actual controversy" is one that is "definite and concrete, touching the legal relations of parties having adverse legal interests"; it is not "an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (citations omitted). The Court has no doubt that this case presents an actual controversy. Once it is established that the court is presented with an actual controversy, the Seventh Circuit teaches that "the standards generally to be applied in

Case 2:21-cv-01103-JPS   Filed 10/18/22   Page 2 of 31   Document 29

exercising discretion to hear a declaratory judgment action are whether a declaratory judgment will settle the particular controversy and clarify the legal relations in issue." *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 579 (7th Cir. 1994) (citations omitted). Factors relevant to these considerations are:

> (1) whether the judgment would settle the controversy;

> (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";

> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and

> (5) whether there is an alternative remedy that is better or more effective.

*Id.*

Here, a declaratory judgment will resolve the parties' "uncertainty and insecurity concerning [their] legal relationship." *Id.* It will also "serve the useful purpose of settling the contractual relationship[]." *Id.* Neither party has presented any evidence concerning "procedural fencing" or "a race for res judicata"; nor is there any allegation that deciding this case would upset the balance between federal and state court jurisdiction. Finally, neither party has presented any evidence of an alternative remedy that is better or more effective. *Id.* (finding "no reason to disturb the district court's decision to adjudicate the claim for declaratory relief" where neither party presented evidence against the court exercising such discretion, including evidence of a better alternative remedy). Indeed, neither party argues at all that the Court should decline to exercise its jurisdiction over

Case 2:21-cv-01103-JPS   Filed 10/18/22   Page 3 of 31   Document 29

their respective declaratory judgment claims. Consequently, the Court will exercise its discretion over the respective declaratory judgment claims and will adjudicate them in accordance with the terms of this Order.

### 3.     RELEVANT FACTS[1]

#### 3.1     The Policy

Jadair is a manufacturer of reclaiming and water clarification systems and is located in Port Washington, Wisconsin.[2] ANPAC issued an Aircraft Insurance Policy, Policy No. AC-01496-03 (the "Policy") to Jadair and its individual executive officers and shareholders with an effective date of June 18, 2019 through June 18, 2020 for a 1978 Cessna P201N Centurion aircraft (FAA Registration No. N1JA) (the "Aircraft").[3] Jadair's owner and president, David Lee Schmutzler ("Schmutzler"), was the pilot of the Aircraft from at least 2012 through his death in 2020.

---

[1]The parties submitted a stipulated statement of undisputed, material facts. ECF No. 20. In large part, the parties' proffered undisputed facts are immaterial. For purposes of the parties' cross-motions for summary judgment, the Court will adopt the *material* stipulated facts with minor, non-substantive edits. Internal citations therein are omitted for brevity.

The Court notes parenthetically that it was required to conduct a "truffle pig hunt" through the documents that the parties exchanged during discovery, which they attach to declarations in support of their stipulated statement of facts, ECF Nos. 19, 21. The statement of undisputed material facts was not written in narrative form as ordered by the Court, ECF No. 13 at 2. Consequently, the facts were submitted illogically and out of order, requiring the Court to turn to the documents to gap fill. ANPAC further violated the Court's Order, ECF No. 13 at 2, to omit a facts section from its briefing, puzzlingly consuming the first nine pages of its moving brief with reproductions of large portions of the parties' proffered undisputed facts.

[2]Jadair International, Inc., *available at* https://www.jadair.com (last visited Oct. 17, 2022).

[3]The Policy also covered a second aircraft, which is not subject to this dispute. ECF No. 1-1 at 4.

Case 2:21-cv-01103-JPS   Filed 10/18/22   Page 4 of 31   Document 29

Prior to ANPAC's issuance of the Policy, on or about June 8, 2019, Schmutzler sent ANPAC an application for insurance together with his pilot history form through his aviation insurance agent. The agent forwarded the forms to the underwriter for ANPAC. ANPAC had previously communicated to Jadair during prior coverage years that it required verification of a valid medical certificate to issue a policy. In his pilot history form, Schmutzler disclosed that he had a special issuance, second-class medical certificate that he had received from the Federal Aviation Administration ("FAA")[4] in August 2018. He further disclosed that he had a waiver on his medical certificate due to an "A-fib Pacemaker 2012." The Policy was bound on June 17, 2019. At the time the Policy was issued, Schmutzler possessed a valid special issuance, second-class medical certificate from the FAA.

Item 9 of the "Coverage Identification Page" of the Policy ("Item 9") reads as follows:

> 9. **REQUIREMENTS FOR THE PILOT FLYING THE AIRCRAFT**: The Aircraft must be operated in flight only by a person having the minimum qualifications shown below. The pilot must have a current and valid (1) medical certificate, (2) flight review and (3) pilot certificate with necessary

---

[4]For the FAA to issue a pilot a medical certificate, the pilot must first (1) apply, (2) be examined by the appropriate level of aviation medical examiner (depending on what class medical certificate the pilot seeks), and (3) show proof of government identification. 14 C.F.R. § 67.4. If certain medical conditions, such as a pacemaker, are reported, the aviation medical examiner cannot issue a medical certificate until it is cleared by the FAA through a "special issuance." 14 C.F.R. § 67.401; *see also* Aircraft Owners and Pilots Association, *Airman Medical Certification*, *available at* https://www.aopa.org/go-fly/medical-resources/airman-medical-certification (last visited Oct. 17, 2022). Special issuance certificates require interim medical reports, as well as additional testing at the expiration point. *Id.*

ratings, each as required by the FAA for each flight. THERE IS NO COVERAGE IF THE PILOT DOES NOT MEET THESE REQUIREMENTS.

**AS ENDORSED**

"Part One" of the Policy, in turn, provides the following provisions:

**Part One. GENERAL PROVISIONS AND CONDITIONS**

. . .

3. Requirements for the Pilot Flying the **Aircraft**

**You** must make certain that the pilot operating the **aircraft in flight** meets the requirements shown in Item 9 of the Coverage Identification Page. There is no coverage under the policy for any **accident** or **occurrence** involving operation of the **aircraft in flight** if the pilot does not meet these requirements.[5]

The "Requirements for the Pilot Flying the Aircraft" endorsement to Item 9

(the "Endorsement") provides the following:[6]

This endorsement completes or changes Item 9. **REQUIREMENTS FOR THE PILOT FLYING THE AIRCRAFT** of **your** Coverage Identification Page to read as follows:

The **aircraft** must be operated **in flight** only by a pilot named below having the minimum qualifications shown. The pilot must have a current and valid (1) medical certificate, (2) flight review and (3) pilot certificate with necessary ratings, each as required by the **FAA** for each flight. There is no coverage if the pilot does not meet the qualifications or requirements specified below for each designated use of the **aircraft**:

**MINIMUM REQUIREMENTS FOR PILOT, PILOT CERTIFICATE, RATINGS AND LOGGED FLYING HOURS:**

As respects N1JA:

Any person having a private or more advanced pilot certificate with airplane single-engine land and instrument-airplane ratings issued by the **FAA** who has logged at least 1,500 total hours as pilot with a minimum of 500 hours in aircraft equipped with retractable landing gear of which not less than 50 hours having been in the same make and model aircraft being operated;

Otherwise,

David Schmutzler

---

[5]Emphasis in original.

[6]Due to the complex issues of contract interpretation that the Court takes up in this Order, the Court reproduces a screenshot of the Endorsement (instead of copying its text into the body of the Order) for ease of reference. ECF No. 1-1 at 5.

Page 6 of 31

Finally, Part Two of the Policy includes the following provision:

> **Part Two. AIRCRAFT PHYSICAL DAMAGE COVERAGE**
>
> . . .
>
> 4. What **We** Will Not Pay
>
> **We** will not pay for physical loss of or damage to the **aircraft**:
>
> *Pilots and Use*
>
> a. Unless the requirements regarding Pilots in Item 9 of the Coverage Identification Page and Use (Item 10) are met . . . .

### 3.2    The Collision

On May 15, 2020, Schmutzler, as the sole occupant, piloted the Aircraft in Burlington, Wisconsin. Schmutzler crashed the Aircraft into the terrain located near the Burlington Municipal Airport (the "Collision"). Schmutzler died from injuries related to the Collision. The Collision resulted in first-party claims by Jadair for physical damage to the Aircraft and medical expenses.[7] The instant lawsuit involves these first-party claims; it does not involve any third-party plaintiffs or third-party claims.

### 3.3    Insurance Claim and Investigation

Schmutzler's last special issuance, second-class medical certificate was the one he obtained in August 2018 and reported to ANPAC in June 2019, when he applied for and was issued the Policy. That medical certificate expired on August 31, 2019.[8] Schmutzler's efforts thereafter to

---

[7] ANPAC notes that Jadair has not provided it with any written proof of the alleged medical expenses to support this portion of its first-party claim. ECF No. 18 at 9 n.38.

[8] Although not material to the Court's determination of the parties' cross-motions for summary judgment, Schmutzler had commenced the application process for a new medical certificate, and submitted for the required medical examination, in early August 2019. The aviation medical examiner deferred

Page 7 of 31

obtain a new medical certificate were unsuccessful. Consequently, on May 15, 2020, the date of the Collision, Schmutzler did not have a valid medical certificate, as required by the FAA.

After the Collision and Schmutzler's death, Jadair submitted a claim to ANPAC for physical damages to the Aircraft. ANPAC assigned a third-party adjuster to the claim ("Plumley"). In his initial report, Plumley focused on Schmutzler's lack of a valid and current medical certificate at the time of the Collision. Specifically, in his June 1, 2020 report, Plumley noted, "I have located information on the FAA website confirming a Commercial Pilot License, however no medical information was listed." In his last report to the carrier, Plumley determined that "[t]he pilot did not meet the pilot warranty due to an expired Medical Certificate."

On July 10, 2020, ANPAC, through its agents, sent Jadair a letter informing it that the continued investigation of Jadair's claim was being conducted under a Reservation of Rights (the "Reservation of Rights Letter"). The Reservation of Rights Letter further stated that the underwriters reserved their rights and defenses under the Policy because Schmutzler did not possess a current and valid medical certificate at the time of the Collision. On October 19, 2020, ANPAC, through its agents, sent

---

Schmutzler's application for further evaluation pending submission of additional medical records. Thereafter, the FAA sent Schmutzler multiple letters requesting the additional medical records in order to assess his eligibility for a renewed special issuance, second-class medical certificate. When Schmutzler did not submit the required information, the FAA informed him on May 19, 2020 that "[b]y virtue of [his] failure to provide requested information, . . . it has been determined that [he is] not qualified for any class of medical certificate at this time." ECF No. 19-1 at 43. The letter further notified Schmutzler that he is "advised that it is unlawful under 14 C.F.R. § 61.53, for [him] to exercise airman privileges unless [he] hold[s] an appropriate medical certificate." *Id.*

Jadair a letter declining any payment on the insured's behalf under the Policy (the "Denial Letter"). The Denial Letter summarizes letters dated August 12, 2019, January 29, 2020, April 14, 2020, and May 19, 2020 from the FAA Aerospace Medical Certification Division, which were sent to Schmutzler, regarding his expired medical certification, as well as the expiration date of August 31, 2019. ECF No. 19-2 at 2–3.

The parties dispute whether any medical condition pertaining to Schmutzler was a cause of the Collision.

4. **ANALYSIS**

### 4.1 The Parties' Respective Claims for Declaratory Judgment

The parties' dispute as to their respective declaratory judgment claims boils down to two questions: (1) whether the language of the Policy excepts the medical certificate requirement as to Schmutzler; and, if it does not, (2) whether Wis. Stat. § 631.11(3) applies, thus requiring ANPAC to prove, in order to deny coverage, that Schmutzler's lack of a valid medical certificate either increased the risk of the Collision or contributed to the Collision. Because the Court answers both questions in the negative, it will grant ANPAC's motion for summary judgment on Jadair's declaratory judgment claim, grant ANPAC's motion for declaratory judgment and enter declaratory judgment in ANPAC's favor on its counterclaim, and deny Jadair's motion for summary judgment and declaratory judgment.

#### 4.1.1 The Policy Does Not Except the Medical Certificate Requirement as to Schmutzler

Because this case is in federal court by way of diversity jurisdiction, the Court applies the choice of law rules of the forum state: Wisconsin. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Wisconsin law, courts are to apply contract choice of law rules to construction of an

Page 9 of 31

insurance policy. *State Farm Mut. Auto. Ins. Co. v. Gillette*, 641 N.W.2d 662, 670 (Wis. 2002). "In contractual disputes, Wisconsin courts apply the 'grouping of contracts' rule, that is, that contract rights must be 'determined by the law of the [jurisdiction] with which the contract has its most significant relationship.'" *Id.* at 670–71 (quoting *Am. Std. Ins. Co. v. Cleveland*, 369 N.W.2d 168 (Wis. Ct. App. 1985)). Here, the Policy was issued in Wisconsin between ANPAC, an insurance company doing business in Wisconsin, and Jadair, a Wisconsin resident. The Policy covers an aircraft owned by Jadair; therefore, Wisconsin is the state with which the Policy has its most significant relationship and Wisconsin law governs interpretation of the Policy. The parties agree that Wisconsin law applies.

Under Wisconsin law, "[t]he interpretation of an insurance policy contract is a question of law for the Court." *Design Basics LLC v. J & V Roberts Invs., Inc.*, 130 F. Supp. 3d 1266, 1284 (E.D. Wis. 2015) (quoting *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004)). "The primary objective in interpreting a contract is to ascertain and carry out the intentions of the parties." *Id.* When analyzing the language of a contract, Wisconsin courts "interpret the language consistent with what a reasonable person would understand the words to mean under the circumstances." *Md. Arms Ltd. P'ship v. Connell*, 786 N.W.2d 15, 20–21 (Wis. 2010) (citations omitted); *see also Colectivo Coffee Roasters, Inc. v. Soc'y Ins.*, 974 N.W.2d 442, 446 (Wis. 2022) (when interpreting insurance policies, "[o]ur goal is to give effect to the parties' intent, construing the policy as it would be understood by a reasonable person in the same position as the insured").

Such interpretation is a three-step process:

First, the court must examine the facts to determine whether the policy's insuring agreement makes an initial grant of

> coverage. Second, if there is an initial grant of coverage, the court is to examine the exclusions to determine whether any of them preclude coverage. Third, the court looks to whether any exceptions to the applicable exclusions reinstate coverage.

*Design Basics LLC*, 130 F. Supp. 3d at 1285 (quoting *Am. Girl*, 673 N.W.2d at 73). "[I]f the Court is 'faced with two opposing and equally plausible interpretations of state law, [it should] generally choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability.'" *Id.* at 1284 (quoting *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000)).

Item 9 provides that the pilot of the Aircraft must have a current and valid (1) medical certificate, (2) flight review, and (3) pilot certificate with necessary ratings. ECF No. 1-1 at 3. Item 9 further explains that "there is no coverage if the pilot does not meet these requirements." *Id.* (capital letters omitted). The Endorsement "completes or changes" Item 9. *Id.* at 5. Specifically, the Endorsement duplicates the three requirements listed in Item 9 as items the pilot "*must have*," and then provides, in lieu of the "no coverage" language in Item 9, that "[t]here is no coverage if the pilot does not meet the qualifications or requirements specified below." *Id.* (emphasis added). A bold, all-capital letter header reading, "Minimum Requirements for Pilot, Pilot Certificate, Ratings and Logged Flying Hours" follows, under which appears the text, "Any person having a private or more advanced pilot certificate . . . who has logged at least 1,500 total hours as a pilot with a minimum of 500 hours in aircraft equipped with retractable landing gear of which not less than 50 hours having been in the same make and model aircraft being operated; Otherwise, David Schmutzler." *Id.*; *see* Endorsement screenshot *supra* p. 6.

Part One of the Policy separately provides that "[t]here is no coverage under the policy for any accident or occurrence involving operation of the aircraft" if the pilot does not meet "the requirements shown in Item 9 of the Coverage Identification Page." *Id.* at 16. Part Two of the Policy, regarding physical damage to the Aircraft, provides that ANPAC "will not pay . . . . [u]nless the requirements regarding Pilots in Item 9 of the Coverage Identification Page . . . are met." *Id.* at 19. Part Three of the Policy, regarding medical expenses, although not cited in the parties' joint statement of facts, contains similar language. *Id.* at 21 ("We do not cover . . . unless the requirements of the Coverage Identification Page regarding Pilots (Item 9) . . . are met.").

Jadair argues that the Endorsement unambiguously excepts Schmutzler from the medical certificate requirement through the inclusion of the language "Otherwise, David Schmutzler." ECF No. 23 at 3. Jadair contends that its reading is supported by "the context that the policy was issued"; namely, that ANPAC had already vetted Schmutzler's credentials and medical certificate when he submitted his application. *Id.* at 4–5. Alternatively, Jadair argues that the Policy language is ambiguous and, under Wisconsin law, must be construed against ANPAC as the drafter of the Policy. *Id.* at 3–5 (citing *Frost ex rel. Anderson v. Whitbeck*, 654 N.W.2d 225, 230 (Wis. 2002)).

The Policy is ambiguous, according to Jadair's reading, because the Endorsement changes the Item 9 language reading "there is no coverage if the pilot does not meet these requirements" to "[t]here is no coverage if the pilot does not meet the qualifications or requirements specified below." *Id.* at 6–7. The "qualifications or requirements specified below," in turn, do not

include the medical certificate. Moreover, the language "Otherwise, David Schmutzler," indicates, in any event, that any requirements and qualifications listed in Item 9, including as endorsed, would not apply to Schmutzler at all. *Id.* Finally, Jadair contends that the language in Parts One and Two of the Policy excluding coverage where the "requirements" of Item 9 are not met is also ambiguous. *Id.* at 7. This is so because the term "requirements" is "not otherwise specified or defined" in these provisions and, therefore, may be read to refer to only the "qualifications or requirements specified below" in the Endorsement and not *all* of the requirements in the Endorsement, which includes the medical certificate, flight review, and pilot certificate. *Id.* at 7.

In turn, ANPAC argues that, reading the Policy as a whole, Parts One and Two unambiguously confirm that there is no coverage when *any* of the Item 9 requirements are not met. ECF No. 25 at 3. ANPEC contends that a reasonable person would read the word "requirements" in Parts One and Two of the Policy as pertaining to all of Item 9, including as endorsed. *Id.* at 6. The Endorsement adds additional detail as to the pilot certificate, but according to ANPAC's reading, still maintains the original three requirements listed in Item 9 (in the following sequential order): the medical certificate, the flight review, and the pilot certificate. *Id.* at 3–6.

Accordingly, a reasonable person, ANPAC argues, would read the Endorsement (including the language "Otherwise, David Schmutzler") as merely a modification to the pilot certificate requirement, as the Endorsement contains a subsection header set apart from the text titled "Minimum Requirements for Pilot, Pilot Certificate, Ratings and Logged Flying Hours." *Id.* at 7. This reading is supported by the fact that the pilot

certificate requirement appears last in the list of the original Item 9 requirements. *Id.* ANPAC further contends that Schmutzler's conduct shows that he understood the medical certificate to be required for coverage, as he included proof of his medical certificate when he applied for insurance with ANPAC, and was attempting to obtain a new medical certificate up until the time of the Collision. *Id.* at 8.

At the outset, the Court must determine the function(s) of Item 9 and its Endorsement, as well as Parts One and Two of the Policy, in the three-step test for interpretation of insurance policies, as set forth by the Wisconsin Supreme Court in *American Girl*: in other words, whether, if there is an initial grant of coverage, there is an exclusion, and if there is an exclusion, an exception to the exclusion. *Am. Girl*, 673 N.W.2d at 73. The parties have not provided, and the Court has been unable to locate, a Wisconsin case interpreting similar language to that in Item 9 and the Endorsement.

In the absence of such authority, the Court looks to other jurisdictions interpreting identical policy language. *See Design Basics LLC*, 130 F. Supp. 3d at 1286 ("Because Wisconsin courts have not interpreted and applied the 'prior publication' policy exclusion, the Court looks to other jurisdictions for persuasive authority."); *Shafi Enters., LLC v. Travelers Cas. Ins. Co. of Am.*, __ F. Supp. 3d __, No. 21-CV-861-JPS, 2022 WL 3155174, at *6 (E.D. Wis. Aug. 8, 2022) ("Wisconsin courts [look] to how other jurisdictions have analyzed identical policy language for guidance.") (collecting cases). Moreover, reviewing how other courts refer to identical policy language is a method that courts use to categorize such language within the framework of the *American Girl* test. *See, e.g., Kutchera v. State*

Case 2:21-cv-01103-JPS   Filed 10/18/22   Page 14 of 31   Document 29

*Farm Fire & Cas. Co.*, 560 F. Supp. 3d 1242, 1249 (W.D. Wis. 2021) ("[B]usiness-use clauses like State Farm's are commonly referred to as 'exclusions' rather than warranties or conditions in the case law.").

In this instance, courts analyzing language identical to that in Item 9 have construed it as an exclusion to coverage at the outset, rather than an initial grant of coverage with conditions. *See, e.g.*, *U.S. Specialty Ins. Co. v. Skymaster of Va.*, 123 F. Supp. 2d 995, 1002 (E.D. Va. 2000) (policy language as follows permits insurance companies to exclude coverage where a pilot does not possess a current and proper medical certificate: "The aircraft must be operated in flight only by a person shown below, who must have a current and proper (1) medical certificate and (2) pilot certificate with necessary ratings required by the FAA for each flight. There is no coverage under the policy if the pilot does not meet these requirements"); *Am. Eagle Ins. Co. v. Rutland Area Flyers, Inc.*, 949 F. Supp. 243, 250 (D. Vt. 1996) (requirement that pilot possess medical certificate or "[t]here is no coverage under the policy" must be construed as an exclusion); *U.S. Fire Ins. Co. v. W. Monroe Charter Serv., Inc.*, 504 So. 2d 93, 99 (La. Ct. App. 1987) (holding that "requirement that the pilot have a current and proper medical certificate as required by the FAA" is properly viewed as an unambiguous exclusion); *W. Food Prod. Co. Inc. v. U.S. Fire Ins. Co.*, 699 P.2d 579, 581 (Kan. Ct. App. 1985) (language reading "[t]here is no coverage under the policy if the pilot does not meet these requirements" operates as exclusion).

That Item 9 should be construed as an exclusion to coverage, and not an initial grant of coverage with conditions, is in lockstep with Wisconsin law. Under Wisconsin law, "[i]n an insurance policy, an exclusion is a provision which eliminates coverage where, were it not for the exclusion,

coverage would have existed." *Bortz v. Merrimac Mut. Ins. Co.*, 286 N.W.2d 16, 19 (Wis. Ct. App. 1979). An exclusion "does not provide for a forfeiture [of liability], nor need it do so, since there was never an assumption of risk, there can be no liability under the policy." *Id.* (quoting 8 Couch on Insurance § 36:48 (2d ed. 1961)). In contrast, mere "[c]onditions [to coverage] provide for avoidance of liability if they are breached." *Id.* Thus, under Wisconsin law, an example of an exclusion is, "This **policy does not apply** . . . if the occurrence arises out of any power driven machine other than an automobile." *Id.* at 18 (emphasis added). An example of a condition is, "We **do not provide coverage if, without our prior written consent**, a covered building or structure is occupied in whole or in part, or put to its intended use." *Rural Mut. Ins. Co. v. Secura Ins.*, No. 2015AP1864-FT, 2016 WL 8578141, at *1 (Wis. Ct. App. Feb. 3, 2016) (emphasis added).

To be sure, this distinction can be "subtle and hazy." *Kutchera*, 560 F. Supp. 3d at 1246. Here, however, the Court determines that Item 9 provides exclusionary, rather than conditional language: "There is no coverage if the pilot does not meet these requirements." ECF No. 1-1 at 3; *see also Kutchera*, 560 F. Supp. 3d at 1246 ("The clause at issue is written as an exclusion: it states that the policy 'does not apply' to structures used for business purposes. The clause . . . isn't written in conditional language. But it easily could be, without changing its core meaning. For example, the clause could say that other structures are covered, but if the structure is used for business purposes, coverage is forfeited."). As in *Kutchera*, if Item 9 were a condition, rather than an exclusion, it would read something like, "The aircraft is covered, but if the pilot does not meet the specified requirements, coverage is forfeited." It does not; instead, it expressly "limits the scope of coverage

in the first place," rather than serving to void coverage that otherwise exists, in the event that a condition is or is not met. *See Kutchera*, 560 F. Supp. 3d at 2348 (quoting *Bortz*, 286 N.W.2d at 21).

Turning to Parts One and Two of the Policy, the Court determines that these are also exclusions and incorporate the requirements listed in Item 9. In other words, Parts One and Two of the Policy make clear—in provisions separate from Item 9—that there is to be no coverage at the outset when the aircraft is operated by a pilot who does not meet any of the Item 9 requirements. ECF No. 1-1 at 16 ("You must make certain that the pilot operating the aircraft in flight meets the requirements shown in item 9 of the Coverage Identification Page. There is no coverage under the policy for any accident or occurrence involving operation of the aircraft in flight if the pilot does not meet these requirements."); *Id.* at 19 ("We will not pay . . . . [u]nless the requirements regarding Pilots in Item 9 of the Coverage Identification Page . . . are met.").

Having determined that Item 9, Part One, and Part Two constitute exclusions of coverage, applying the Wisconsin Supreme Court's *American Girl* test, the Court construes Jadair's argument regarding the Endorsement as a contention that the Endorsement serves as "an[] exception to [the] exclusion[s] [that] reinstates coverage." *Am. Girl*, 673 N.W.2d at 73. Put another way, Jadair argues that the modified and additional language of the Endorsement serves as an exception that nullifies the medical certificate requirement. *Id.* at 83 (observing that policy endorsements may serve the function of exceptions).

The Court disagrees with Jadair. First, the Endorsement does not omit or nullify the current and valid medical certificate requirement. That

requirement is plainly still listed as something "[t]he pilot *must have*." ECF No. 1-1 at 5 (emphasis added); *see* Endorsement screenshot *supra* p. 6. In turn, Parts One and Two of the Policy exclude coverage when *any* of the requirements of Item 9 are not met. The language "must have" in the Endorsement could not be clearer. The Court is not persuaded by Jadair's argument that the word "requirements" in Parts One and Two of the Policy is ambiguous. A reasonable person would certainly view the language "must have" in the Endorsement as a "requirement." *See Requirement*, Cambridge Dictionary, *available at* https://dictionary.cambridge.org (last visited Oct. 17, 2022) (defining "requirement" as "something that you must do, or something you need").

Second, reading the Policy as a whole, the Endorsement's swap of the language "there is no coverage if the pilot does not meet these requirements" to "[t]here is no coverage if the pilot does not meet the qualifications or requirements specified below" modifies Item 9 in that it additionally excludes coverage when the aircraft is operated by pilots that do not have the requisite flight experience listed below the text. If the Court did not read the Endorsement this way, the carryover of the current and valid medical certificate as an item the pilot "must have"—and the references in Parts One and Two of the Policy to *all* of the requirements of Item 9—would be surplusage. *See, e.g., Maryland Arms Ltd. P'ship v. Connell*, 786 N.W.2d 15, 25 (Wis. 2010) ("When possible, contract language should be construed to give meaning to every word, avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage.") (internal citations omitted).

Third, and moreover, under Wisconsin law, "[a]n exception pertains only to the exclusion clause within which it appears; the applicability of an exception will not create coverage if the insuring agreement precludes it or if a separate exclusion applies." *Am. Girl*, 673 N.W.2d at 73. Thus, even if the Court reads the Endorsement's swap of the language "there is no coverage if the pilot does not meet these requirements" to "[t]here is no coverage if the pilot does not meet the qualifications or requirements specified below" as an exception reinstating coverage even when the pilot lacks a current and valid medical certificate, Parts One and Two of the Policy, which reference *all* requirements of Item 9—including the medical certificate, which is explicitly carried over into the Endorsement—constitute separate exclusions that preclude and/or override the exception.

The same is true for the language "Otherwise, David Schmutzler." As the Endorsement appears on the page, the "Otherwise, David Schmutzler" clause is underneath the newly-added requirement explaining the requisite flight experience. All of this language is separated from the incorporated requirements from Item 9 (the medical certificate, flight review, and pilot certificate) by a horizontal line and a bold, all-capital letter header. ECF No. 1-1 at 5; *see* Endorsement screenshot *supra* p. 6. Thus, a reasonable person would view the "Otherwise, David Schmutzler" qualifier as an exception to the flight experience requirement, not to the medical certificate requirement. *Ruttenberg v. U.S. Life Ins. Co. in City of New York*, 413 F.3d 652, 667 (7th Cir. 2005) ("In interpreting a contractual term, we cannot give meaning to a word standing alone. Rather, we must take into account its placement in the text and discern its proper relationship to the text in which it is placed."). Additionally, the inclusion of the

Case 2:21-cv-01103-JPS   Filed 10/18/22   Page 19 of 31   Document 29

"Otherwise, David Schmutzler" language does not change the fact that the Endorsement clearly retains the portion of Item 9 requiring the pilot to have a current and valid medical certificate, and that Parts One and Two of the Policy are separate exclusions of coverage if that requirement is not met.

For these very reasons—that the medical certificate language is carried over to the endorsed Item 9, and Item 9 is, in turn, referenced as a whole elsewhere in the Policy—the cases cited by Jadair are inapposite. *See* ECF No. 23 at 7–8. For example, in *American States Insurance Co. v. Southwest Aircraft Leasing Inc.*, Item 7 of the policy provided, "Only the following pilot or pilots holding valid and effective pilot and medical certificates . . . will operate the aircraft in flight. See Endorsement No. 2." 717 F.2d 1189, 1190 (8th Cir. 1983). A separate provision excluded coverage where "the aircraft is operated in flight by other than the pilot or pilots set forth under Item 7." *Id.* Endorsement No. 2 read, "It is agreed that the typewritten portion of Item No. 7 of the Declarations shall read as follows: Howard A. Bellows provided he has a current private or commercial certificate with a multiengine rating and a minimum of 2800 logged pilot hours of which at least 1,550 hours have been in multiengine aircraft." *Id.* The court held that, because the exclusion "fails expressly to incorporate the medical certificate language" of Item 7, coverage was not excluded for the pilot's failure to possess a valid medical certificate. *Id.* Here, the Item 9 exclusion, as endorsed, explicitly incorporates the medical certificate requirement from the unendorsed Item 9. Thus, even if the additional language of the Endorsement served as an exception, other exclusions within the Policy refer to *all* requirements of Item 9—of which the Endorsement clearly still lists a valid medical certificate.

*Ranger Insurance Co. v. Culberson* is similarly unavailing. 454 F.2d 857 (5th Cir. 1971). Indeed, there, where the pilot of an insured aircraft crashed the aircraft while possessing only a student license (not a pilot certificate), the Fifth Circuit examined the parties' policy and noted that the insurer did not check a box to add an exclusion forbidding coverage "to any Insured who operates or permits the aircraft to be operated . . . in violation of any regulation pertaining to pilot certificates." *Id.* at 863. The Fifth Circuit reviewed an opinion from the Georgia Court of Appeals holding that a policy containing a clause "providing that there should be no coverage when the aircraft was operated in violation of any regulations pertaining to Airman's Certificates." *Id.* (citing *Grigsby v. Houston Fire & Cas. Co.*, 148 S.E.2d 925 (Ga. Ct. App. 1966)). The Georgia Court of Appeals analyzed that exclusion and found that the pilot's failure to obtain a valid medical certificate violated the terms of his policy, thus triggering the exclusion. *Id.* (citing *Grigsby*, 148 S.E.2d at 925).

Because the insurer in the case before it *did not check* the box to apply a similar exclusion to the policy, the Fifth Circuit in *Ranger* held that coverage was not suspended due to the insured's alleged improper pilot certificate. *Id.* Jadair seemingly relies on language in the *Ranger* opinion stating that, "if Ranger wished to suspend coverage in the event of any violation of Culberson's pilot certificate, then it should have specifically said so in the policy." *Id.* That language is simply inapplicable here, where Item 9, as endorsed, explicitly lists the medical certificate requirement, and Parts One and Two of the Policy exclude coverage where *any* of the Item 9 requirements are not met.

Jadair also relies on a separate portion of the *Ranger* opinion that, like the *American States* opinion, deals with an exclusion that "does not incorporate by its terms all of" a separate clause in that it "omits any reference to or incorporation of" a separate clause. ECF No. 23 at 8 (citing *Ranger*, 454 F.2d at 866). Again, however, the Endorsement does incorporate the medical certificate requirement as something the pilot "*must have*"; moreover, other portions of the Policy exclude coverage for violations of *any* of the requirements. ECF No. 1-1 at 5. The other cases that Jadair cites do not help it for the same reasons. *Id.* (citing *Nat'l Indem. Co. v. Demanes*, 150 Cal. Rptr. 117, 118 (Cal. Ct. App. 1978) (coverage not excluded for failure to meet pilot requirements where "[t]he exclusion does not refer to the qualifications of the pilots, but to their identities"); *Bayers v. Omni Aviation Managers, Inc.*, 510 F. Supp. 1204, 1207 (D. Mont. 1981)[9] ("In this case the insurance company could easily have incorporated the medical certification requirement in its exclusion clause. It did not, and it must be held to provide coverage.").

Thus, for all these reasons, the Court determines that the Policy does not except the medical certificate requirement as to Schmutzler. Because Schmutzler did not have a current and valid medical certificate at the time of the Collision, the Policy exclusions apply and exclude coverage as to the first-party claims subject to this lawsuit.

---

[9]The Court notes parenthetically that the *Bayers* court observes that the question has resulted in a "split of authority." 510 F. Supp. at 1206 (collecting cases holding along the lines of the cases cited by Jadair, alongside cases holding the opposite, i.e., that text in an initial clause that is not explicitly carried over to another clause still stands, as it served to modify the initial clause). Thus, even if the Court were persuaded by Jadair's textual argument, it would certainly not be as clear cut of a conclusion as Jadair suggests.

### 4.1.2   Wis. Stat. § 631.11(3) Does Not Apply

Jadair argues that, if the Court holds that coverage is excluded based on the text of the Policy, ANPAC wrongfully denied coverage because it cannot prove that any medical condition of Schmutzler's increased the risk of the Collision or contributed to the Collision. ECF No. 23 at 9. Having determined that the Policy excludes coverage, the Court turns to this argument.

In support of its causation argument, Jadair refers the Court to Wis. Stat. § 631.11(3). That statute provides:

> EFFECT OF FAILURE OF CONDITION OR BREACH OF PROMISSORY WARRANTY. No failure of a condition prior to a loss and no breach of a promissory warranty constitutes grounds for rescission of, or affects an insurer's obligations under,[10] an insurance policy unless it exists at the time of the loss and either increases the risk at the time of the loss or contributes to the loss. This subsection does not apply to failure to tender payment of premium.

---

[10]Rescission and the insurer's "obligation" to pay under a policy (or, in other words, to accept versus reject a claim for coverage) are distinct concepts. *See Wis. Hous. & Econ. Dev. Auth. v. Verez Assur., Inc.*, 480 N.W.2d 490, 492 (Wis. 1992). "The effect of recission is to restore the parties to the position they would have occupied if no contract had ever been made between them." *Seidling v. Unichem, Inc.*, 191 N.W.2d 205, 208–09 (Wis. 1971) (holding that, on judgment of rescission of contract, plaintiff is entitled to return of the monies he spent to enter into the contract).

In the insurance policy context, courts have interpreted rescission as occurring when a premium is returned, coupled with a statement that the policy is rescinded. *Verez*, 480 N.W.2d at 492. Rejecting a claim under a policy does not constitute even an "attempt[] to rescind coverage." *Id.* Consequently, and as discussed further herein, courts applying Section 631.11(3) have analyzed denial of coverage based on failures of conditions or breaches of promissory warranties through the "insurer's obligations under" a policy prong of the statute, not the rescission prong.

Jadair argues that ANPAC is unable to produce any evidence showing that Schmutzler's lack of a valid and current medical certificate increased the risk of or contributed to the Collision; therefore, under Section 631.11(3), ANPAC cannot deny coverage under the applicable Policy exclusions. The parties do not cite, and the Court has not located, any Wisconsin case law interpreting Section 631.11(3) in the context of an aviation insurance policy. However, Wisconsin case law exists interpreting the statute generally.

In *Kutchera*, the Western District of Wisconsin undertook a thorough review of Wisconsin case law interpreting Section 631.11(3). 560 F. Supp. 3d at 1246. The court determined that the language of Section 631.11(3) expressly precludes denial of coverage without proof of causation only where there is a failure of a condition or a breach of a promissory warranty. *Id.* Thus, the threshold question when determining whether Section 631.11(3) applies, and an insurer must prove causation, is "whether the clause is a 'condition' or a 'promissory warranty' . . . or simply an exclusion." *Id.* at 1246–48 (citing *Fox v. Cath. Knights Ins. Soc.*, 665 N.W.2d 181 (Wis. 2003) (reviewing jury instructions pertaining to Section 631.11(3) and determining it applies only to conditions and warranties subsequent to policy issuance); *Bortz*, 286 N.W.2d 16 (generally distinguishing conditions and warranties from exclusions)). The *Kutchera* court rejected the insurer's invitation to "eschew the distinction for a more functional approach," given Wisconsin courts' longstanding recognition of the distinction. *Id.* at 1249. The Court reaches the same conclusion here.

The Court has already determined that the pertinent provisions—Item 9, as endorsed, as well as Parts One and Two of the Policy—are exclusions; therefore, Section 631.11(3) does not apply, and ANPAC need

not prove causation, on this basis alone. That these provisions are properly construed as exclusions to coverage rather than conditions to otherwise existing coverage further makes sound public policy. If the Court were to view these provisions as conditions, it would give an insured a strong incentive to deceive an insurer at the outset in order to enter into a policy, all the while hoping that it may later force the insurer to cover a loss despite its deceit because the insurer may be unable to prove causation. *See Kutchera*, 560 F. Supp. 3d at 1249 (rejecting causation as applied to business-use exclusion because not doing so would "hurt[] insurers because they are deceived into issuing a policy that they wouldn't issue if they had all the facts, and [] may also hurt business owners who find themselves without coverage when a loss is business-related") (citing *Fox*, 665 N.W.2d at 192 (rejecting argument that § 631.11(3) applies to conditions precedent in part because of a concern expressed in the legislative history about encouraging deception and giving insureds no incentive to fulfill requirements for obtaining coverage)).

Additionally, that Section 631.11(3) is to apply only to conditions and warranties, which are often at the whimsy of the insurer to either enforce or waive when a failure or breach arises, also makes sound public policy. An insurer should not be able to alter its obligations under a policy based solely on subjective grounds; the statute provides a safeguard against the potential for abuse by requiring proof of causation before enforcing a condition or warranty, while still preserving the equally important policy of freedom of contract. *See Fox*, 665 N.W.2d at 191 (discussing legislative history behind Section 631.11(3) and intent to treat conditions and warranties the same because treating them differently "allow[s] insurers to

evade a warranty statute by couching the provision in conditional language," as well as an intent to avoid granting the insurer "arbitrary power" and the insured the capacity to commit fraud) (citations omitted).

In the specific context of aviation insurance policies, the majority of jurisdictions to consider whether causation is required hold that it is not. *See Ranger Ins. Co. v. Kovach*, 63 F. Supp. 2d 174, 180 (D. Conn. 1999) (disagreeing with the District of Montana's conclusion "that because there was no causal connection between the accident and the pilot's lack of a valid medical certificate, the insurer could not avoid coverage" because that conclusion "represents the minority position [and] **[t]he majority view does not require a causal connection between the accident and the breach of a policy term or provision**") (collecting federal and state court cases across the United States) (emphasis added).

These jurisdictions, by and large, do so with reference to the additional public policy in favor of upholding policy exclusions relating to safety. *See, e.g., id.* ("The majority view is that the insurer is entitled to rely on a policy provision that unambiguously makes coverage dependent on the pilot of the aircraft meeting particular experience standards."); *see also, e.g., Griffin v. Old Republic Ins. Co.*, 133 P.3d 251, 255 (Nev. 2006) ("We agree that aircraft safety is enhanced when policy exclusions relating to safety are upheld, regardless of causal connection. Although the minority approach requires a causal connection, we now join the majority and hold that insurers may avoid liability under safety-related exclusions in aviation insurance policies."). The Court joins these jurisdictions. An insurance policy provision excluding coverage for failure to comply with air safety regulations makes well-reasoned public policy.

Case 2:21-cv-01103-JPS  Filed 10/18/22  Page 26 of 31  Document 29

ANPAC urges the Court in the first instance not to consider Section 631.11(3) because Wis. Stat. § 632.23 is the more specific statute and controls over the less specific Section 631.11(3). ECF No. 25 at 12 (citing *Clean Wis., Inc. v. Pub. Serv. Comm'n*, 700 N.W.2d 768, 825 (Wis. 2005) (holding that if statutes may not be harmonized or reconciled, the more specific statute controls)). Section 632.23 provides:

> PROHIBITED EXCLUSIONS IN AIRCRAFT INSURANCE POLICIES. No policy covering any liability arising out of the ownership, maintenance or use of an aircraft, may exclude or deny coverage because the aircraft is operated in violation of air regulation, whether derived from federal or state law or local ordinance.[11]

ANPAC scorches the earth on the legislative history behind Section 632.23, which indicates that the exclusion or denial of coverage when an aircraft is operated in violation of air regulations applies only to third-party claimants alleging tort liability; "[t]here is no justification for removing nonliability coverages from the realm of free contract." ECF No. 25 (quoting 1975 S.B. 642 at 1153, 1186); *see also* Wis. Legis. Council Rep. No. 17 to the 1975 Legis., at 2 (1975) ("Section 632.23 continues to recognize that the insured and his insurer **may exclude policy coverage when an aircraft is operated in violation of the law** but prohibits the parties from preventing liability coverage to third party claimants . . . . Rights of third parties may not be affected by the breach.") (emphasis added).

---

[11]With scant exception, FAA regulations require a pilot to possess a valid and appropriate medical certificate to operate an aircraft. 14 C.F.R. § 61.3(c); *see also generally* 14 C.F.R. § 61.23; 14 C.F.R. § 67. Depending on the type of certificate issued, FAA regulations specify the expiration date. 14 C.F.R. § 61.3(d).

The Court agrees with ANPAC that Section 632.23 is not applicable to the instant first-party claim. The Court notes parenthetically, however, that it is possible to harmonize Sections 632.23 and 631.11(3) and, therefore, to avoid any doubt, rejects ANPAC's argument that Section 632.23 "controls" over Section 631.11(3) in circumstances such as these. Indeed, the provisions may be harmonized for the very reason ANPAC proffers to distinguish Section 632.23 from the instant action: it applies only to third-party claims. In the absence of legislative history indicating that the proof of causation required by Section 631.11(3) is also intended to apply only to third-party claims, the provisions may be harmonized. *See Fox*, 665 N.W.2d at 190 (examining legislative history of Section 631.11(3), which includes application to first-party claims). Whether the proof of causation required by Section 631.11(3) for failures of conditions or breaches of promissory warranties muddies the waters as to the separation of contract and tort claims, as ANPAC implies, ECF No. 25 at 18, is an issue for the Wisconsin legislature, not this Court.

Therefore, for all these reasons, the Court will grant ANPAC's motion for summary judgment on Jadair's declaratory judgment claim, grant ANPAC's motion for declaratory judgment and enter declaratory judgment in ANPAC's favor on its counterclaim, and deny Jadair's motion for summary judgment and declaratory judgment.

### 4.2    Jadair's Claim for Bad Faith

Jadair's second claim alleges that ANPAC acted in bad faith in denying it coverage. ECF No. 1 at 4. "Under Wisconsin law, to prove a bad faith denial of benefits claim, a plaintiff must show: (1) 'the absence of a reasonable basis for denying benefits of the policy,' and (2) 'the defendant's

knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.'" *Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 595 (7th Cir. 2012) (quoting *Anderson v. Cont'l Ins. Co.*, 271 N.W.2d 368, 376 (Wis. 1978)). In line with the first element, a finding of a wrongful denial of benefits is a condition precedent to a first-party bad faith claim based on wrongful denial of benefits. *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 798 N.W.2d 467, 483 (Wis. 2011)).

Jadair argues that, because ANPAC "did not have the justification to rescind the aircraft insurance policy issued to Jadair," it "axiomatically has committed bad faith." ECF No. 24 at 1 – 2 (citing *Pum v. Wis. Physicians Serv. Ins. Corp.*, 727 N.W.2d 346 (Wis. Ct. App. 2006)). In *Pum*, the insurer sent the insured a letter explicitly informing her "that it was rescinding and voiding the coverage issued to her." Brief for Plaintiffs-Appellants, *Pum*, 727 N.W.2d 346 (No. 2005AP3049), 2006 WL 6140962, at *11. As explained, rescission and denial of coverage are distinct concepts. *See supra* footnote 10. There is nothing in the record indicating that ANPAC rescinded the Policy. Therefore, because the Court has already determined that ANPAC did not wrongfully deny coverage in this instance, which wrongful denial is a condition precedent to a bad faith denial of benefits claim, it will grant summary judgment to ANPAC on Jadair's bad faith claim.

**5.      CONCLUSION**

For the reasons explained above, the Court grants ANPAC's motion for summary judgment on Jadair's declaratory judgment and bad faith claims. The Court further grants ANPAC's motion for declaratory judgment and enters declaratory judgment in ANPAC's favor, as specified below and in the judgment that follows, on its counterclaim. The Court

finally denies Jadair's motion for summary judgment and declaratory judgment. Consequently, the entire action will be dismissed with prejudice.

Accordingly,

**IT IS ORDERED** that Defendant American National Property and Casualty Company's motion for summary judgment, ECF No. 17, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant American National Property and Casualty Company's motion for declaratory judgment, ECF No. 17, be and the same is hereby **GRANTED** and declaratory judgment will be **ENTERED** as follows:

> There is no coverage for the collision that occurred on May 15, 2020 under the Aircraft Insurance Policy, Policy No. AC-01496-03, between Jadair International, Inc. and American National Property and Casualty Company, and/or such coverage is excluded by the terms, conditions, definitions, limits, and exclusions of the Aircraft Insurance Policy, Policy No. AC-01496-03, between Jadair International, Inc. and American National Property and Casualty Company.

**IT IS FURTHER ORDERED** that Plaintiff Jadair International, Inc.'s motion for summary judgment and declaratory judgment, ECF No. 22, be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly; such judgment shall set forth the foregoing declaratory judgment.

Dated at Milwaukee, Wisconsin, this 18th day of October, 2022.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge